All the specification of the challenge patent says, and this is at JA902, which is the 290 patent specification, at column 10, lines 10 to 25, it states that the battery pack can power various power tools and supply an average discharge current of 20 amps. But there's no explanation in the patent anywhere of what, or that average discharge current being over the entire rated capacity of the battery. Over the entire rated capacity, that came from a dictionary definition somewhere, right? It came from Dr. Assani. That's the only evidence that's cited to by Milwaukee in their brief. They cite to Dr. Assani, who's one of their experts, at JA12336-337. But Dr. Assani, when you look at that actual site... So wasn't there a district court construction? There was a district court construction. And the district court construction relied on the dictionary definition? It cited to a dictionary definition, but I don't think the dictionary definition says that it's over the entire rated capacity. So what the district court stated, and this is at JA4976, and this is part of the decision on claim construction from the district court, is that the capacity of a battery is normally measured by discharging at a constant current until the battery has reached its terminal voltage consistent with MECO's construction. And that's from the district court, but the district court... Did that definition include, or does it involve a measurement from the IEEE? It cites to the IEEE, the I-triple-A. And who took the measurement for the IEEE? It's not clear who took the measurement. This is from a dictionary definition, not an actual test that's run by the IEEE. And nowhere does the IEEE talk about an average discharge current. There's no definition in the IEEE that average discharge current is over the entire rated capacity. What the court was doing, in our view, was simply saying that one test, and we don't the battery, is a constant current discharge test. And here, had the applicant wanted to claim that the battery pack met the constant or continuous current discharge test, they could have used that language, but they chose to use the word average. And average is not a single continuous. In fact, as we saw from Mr. Meyer's declaration, he used a test where the average was, and he makes this test using these multiple cuts, but the average current, even though the current goes above and below 20 amps, the average current is still identified as being 26 amps. Now the claims were allowed over this, not because this test did not meet the average discharge current test, but instead the applicant said, and this is at JA31005-006, that the cell's temperature exceeded the operating specifications for the pack, or for the cell, and that's why it failed. But there's never any disclaimer or statement that this intermittent test failed because it did not meet the 20 amp limitation, or it did not produce an average discharge current of 20 amps. Is the 20 amp limitation, is that measured over the entire capacity of the battery, the life of the capacity of a battery, or at the peak of those intermittent uses that you're talking about? It's over the, in our proposed construction, we believe it's over a time consistent with the use of a hand-held power tool. So if you're drilling 10 screws, for example, it's that time that you're using the battery pack. From the time you drill the first screw, you may have a spike in current, and then it drops, and then you do the next screw, there's a spike in current. So we think, for example... When you say consistent with the use of the tool, is that your proposed construction? The way I use a tool is maybe two screws. The way the construction guy on the roof uses the tool may be 500 screws. It's unclear, but I think it could be over the life of the battery as used with the tool. It doesn't require that it be a single continuous discharge where you hook the battery up to a tester. So I guess what I'm maybe trying to get at is, are you making two distinct points? One is the time period, or the period, it may not even be measured in time, but rather battery capacity over which the average is measured. And the other is the portion of the board's claim construction that says it needs to, I forget the exact language, but stay reasonably close to 20 amps. So that you could get a 20 amp average over the life of the capacity with a lot of peaks and valleys, I suppose. You can, and that's exactly what Mr. Meyer did. So I think it would be over the life of the battery, even if it's intermittent use, where it goes above 20, as you suggested, or below 20 when you're performing that screwing operation. But wasn't it reasonable for the board to say, this patent is about a battery pack for use with a variety of different tools, some of which will have lots of intermittent on-offs, and some of which will have a steadier use. And since this is supposed to be useful for all of them, that in context, the broadest reasonable reading is what it gave. Namely, it's not tool-specific, which I take it to be the real core of your argument, that it should vary from tool to tool. It's not tool-specific, but all the tools that are disclosed in the specification are a driver drill and a circular saw. And those are used intermittently. And the athletes have made this argument that the most demanding power tool is a circular saw. But even a circular saw, it's unlikely you're going to cut a 40-foot board. You're cutting two-by-fours. So maybe it's 20 seconds in the most demanding application for a cut. Or a piece of plywood, again, it's 15 to 20 seconds. And then you're picking up the tool, you're moving to the next spot, and making a cut. And there's no disclosure in the specification of using the tool for one continuous cut. And I think that would actually be a much narrower construction than the broadest reasonable interpretation, which is you're using the battery pack with a tool. OK. You're into your rebuttal time, but we'll restore you back to four minutes. Thank you, Gary. Good morning, Your Honors. May it please the Court. At issue here are three patents that have been through 20 post-grant proceedings, as well as a district court trial. In the district, do I remember right? I think we got some correspondence in November. There was litigation in Wisconsin between these two parties. And was there an enablement defense presented? There was not. So one of the things that's, maybe you can just help me out, and I'm not even sure it's relevant here, obviously. IPRs are not based on enablement. Show me where in the spec the patent says, here's how we were able to do what nobody else had been able to do before. Sure. It's a combination of things. So the patent describes, and this was an issue in the re-examinations, because in the re-examination proceedings, enablement was raised. So we had an expert there, Dr. George Blomgren, and in response to the enablement question that was presented in the re-examination proceedings, he went through and described what a person of ordinary skill in the art would need to know about this battery pack in order to make it. He said there's a couple of fundamental building blocks that you need to know. You need to know the size and the shape of the cells. You need to know the chemistry of the cells. You also need to know about pack management and other things that would allow that battery pack to produce the high currents that handheld power tools needed. And that's what this invention solved. Before this invention, there was never a lithium chemistry-based battery pack that could supply the high currents that handheld power tools like these need. But all those elements you just laid out, those were known in the art. They were yes and no. So it was known that you had to have a chemistry. It was known that you had to have a certain size cell. But the specific size cell here, for example, the 70 millimeters in length, that was something that was not known in the art. And that was something that was new with this invention, a specific size. And it's really all the pieces that go together to make that puzzle to work. So having a certain size, a shape, a chemistry, and then how you arrange them actually in the pack as well to manage the heat and other things. Because when you're drawing these high currents... But wasn't it known that the size can be limited according to its use? I would not say that. I would say it was known that you could have different sizes. But one of the things that they figured out here was to have additional material added to the cells, the size, to allow it to make the 20-amp limitation. That's really the key here is the Milwaukee folks determined that in order to have this be feasible, to make it work in the type of applications that they needed it to work in, they needed to have the 20-amp capability for the life. I mean, if you didn't get that entire life, and this goes back to the claim construction, the whole point here is that this is not about having a battery pack that could deliver 20 amps for a second or two seconds. That wouldn't be sufficient for use with a handheld power tool. It just wouldn't work. So they had to come up with a way to make this work where you could get 20 amps from the start to the end of that charge, the whole life of the pack. Getting back to the re-exam, didn't the examiner at some point, when it eventually let the claims go through, declare that the real invention here is not how to put a bunch of batteries together to crank up the 20 amps, but it was more about battery pack management and design? When you read the patent, you see that's what the focus of the patent specification really is? I would disagree partly with that. It's a component. Again, it's sort of a puzzle that goes together with all the different components. So you have to have the right size, shape, cell, the right chemistry, and then you have to put it together in a way that actually works for this use, this use for the handheld power tool. So it is really a combination of all those things that went into making this work. So I would agree that there was some discussion of that, but it's not that alone. There was actually all the things that came together, the selection of the chemistry, the selection of the size and the shape, and then how you actually put them together in the pack was what made this thing work, and that's why it's been so successful. Going to the claim construction, there's an argument that the board didn't account for the word average in the claim. Average, discharge, current. So, I mean, I guess what I'm wondering is, is it your view that the board actually believes that its construction, even though it didn't say the word average, like it says in the claim, it necessarily is there, and that's part of the claim construction that we're talking about, you know, about 20 amps, average discharge current over the capacity of the pack. Or do you think that would be an alteration of the claim construction, to all of a sudden insert that word average into the construction? I think yes on both of those points. I think yes, the construction... My question? Yes. So, yes, I think that the board likely believes that average is already built into the construction, just as the district court did, and we had another construction more recently from the most recent trial in Wisconsin, where the judge went through and explained exactly why this construction does account for the average requirement and saying, as you look at the construction, one way to look at average is just to say, you know, total up a bunch of numbers and then divide by something. That's one way, but in the context of this patent in this industry, it's shown that constant current discharge tests are the way that these things are done, and when you run it at 20 amps, constant current, that is the average over the entire pack. So question one is yes, I believe the board accounted for average, and I do think it would be a change, an alteration, if you now put the word average in expressly. When you attach the battery pack to a power tool, a drill, a circular saw, whatever, and then all of a sudden, isn't there this intermittent current going up and down like crazy? There would be, and that's why I think that that's such... So how am I supposed to think that's continuous current? So that's why I think that, and this is what was found in the district court as well, that is not the right way to test for this. If you look at the claim, it's directed to a battery pack. We are talking about the capabilities of a battery pack. It says nothing about a tool being required to be attached to it. That's one of the problems with the construction offered by the appellant, and I think you picked up on it, is once you start introducing variables like a tool, a specific type of tool, you run into all kinds of problems. What type of tool are we using? How are you using it? Are you drilling a hole with a drill bit? Put aside the general suggestion that the claim construction should account for specific tools. Put that aside. It feels to me like it's a different point to say that when the claim says capable of an average, at least the broadest reasonable construction doesn't incorporate a notion of hovering around the average through all of the use. As long as you get to the average, it doesn't matter how spiky the graph would be. Let me address that, and I think you asked two questions. One is about duration, and one is about up and down. Let me talk about both of those. I think I heard you. Let's talk about up and down. I'm not that worried about duration. On up and down, in this industry, with this application, it is absolutely the way you test using a constant current discharge test. This is about the capability of a battery pack. If you look at all the evidence, you look at the declaration from the inventor, Gary Meyer, he talks about how constant current discharge tests are why we use to test battery packs. If you even look at the prior art that's been asserted here, look at Linden. That's the battery textbook. That talks about constant current discharge tests. If you look at Sado, their primary reference that they're relying upon, what does it show? Constant current discharge tests. Because that is how you test the capabilities of a battery pack. It's known, that's what people in the industry believe, and that's how they test these things. Was there contrary evidence? No, I don't believe so. Not that it was credited by the board. That wasn't my question. One question is whether there was Let's start with the first question. Sure. In terms of, can you run other types of tests with tools? Sure. You can put a battery pack on a tool and run a test with it. My colleagues over here will probably stand up and say, if you look at the test results, if you look at our brief, one of the things that our inventors did when they tested a prototype pack was do cutting tests. They took a circular saw, they hooked a battery pack up to it, and they ran tests to see how many boards can we cut. And that's one type of testing that you can do. That is not the type of test that folks use to evaluate a battery pack. This is a claim that's directed to a battery pack. And it's about the capability of that pack that's important. And when you start running all these different test tools, specific to everything else, and doing the up and down, there's so many variables that come into play. The type of material. Are you drilling hard material or soft material? Are you using a bit or a blade? Is it dull? Is it new? I guess in the end, I'm still trying to make sure I understand. The claim says average. You keep drawing me back to saying, well, I should, in my head, translate average to constant continuous. Over the entire capacity. But again, that seems to exclude a conception of average that Judge Toronto was referring to about these swings, these high swings up and down that ultimately leads to an average current of, say, 20 amps. What is it in the record that makes it clear that even though everybody in this industry, when it comes to these battery packs and power tools, is talking about constant current and continuous current, your patent, when it says average current, also means what the industry is talking about when the industry is talking about continuous and constant. That's the bridge that I'm interested in you crossing or helping me cross. I would point you to the declaration that was submitted by the inventor Gary Meyer and that's at Appendix Sites 46087 through 46091. Now what was happening there was Can you give me a hint as to which of these volumes that's in? It should be in volume 3. The thing on the cover is self-editing. It should be in volume 3. Part what? I don't know. And it's in the 46,000 range? Correct, yes. What was the number exactly? 46,087. Part 3. Volume 3, part 3, and 3. Mine are done in just volume 1, 2, and 3. I don't have... And what was the exact number? 46087 through 46091. Alright, which paragraph number? Let's start with 6. 46087. And where does it say when I used average discharge current in the claims? I meant industry accepted way of understanding current discharge as constant current discharge. Obviously we're not going to see that exact statement. What's the best paragraph you've got for me? 46,087 to 46091. Correct. Let me give you some background here. So what we're doing here is there was a prototype battery pack that Milwaukee was testing. And what they did to evaluate whether this could meet what they were looking for was they ran tests on it. They did some cutting tests but importantly they ran constant current discharge tests. And what the inventor says here is and I'll look at paragraph 10 he says in each of the discharge tests the rapid drop off in voltage was followed by recovery of the voltage to approximately 20 volts after the pack was disconnected. Then he says this demonstration that the pack had not been substantially discharged by a constant load of 20 amps over a period of time regardless of voltage cut off. So what he's saying here is by testing this at a 20 amp constant current discharge and then realizing that the voltage collapsed it couldn't continue discharging he knows that this is not working because it's not getting the entire capacity out. So when you look at all the description here he talks about the key to this requirement is that you can get 20 amps of constant current over the entire capacity. And if you don't get the capacity you're not passing the test. So that's the best that I can point you to. We don't have a statement if I could go back and change the file history I would but we don't have that. The best we have is all the statements from the inventors here. Then you also have the other contemporaneous evidence. The Sato reference, the Linden textbook, everything in this industry points to this is how things are described for this type of test. Suppose that the battery's discharged with one cut and at the peak of that cut you have 20 amps. What does that do to your argument? If the entire capacity was discharged in one cut then I think that that would be an indication again I don't think that's the right way to test because cutting brings in a lot of variables in terms of the tool, how you're using it the material you're cutting, the blade and everything else. Well it goes to my understanding what we're talking about when we say average and I ask your colleague whether we're talking about a 20 amp average at the peak of the cut or during the capacity of the battery. So again I think that trying to, this is the problem you run into with trying to evaluate this if you're using different materials and different tools to cut. We have maintained all along the way that you test for meeting this claim requirement is a 20 amp constant current discharge test. Doesn't this problem go back to the use of a dictionary by the district court which relied on a power measurement that itself is unknown? I don't think so at all. I think that that shows you that in this industry when you talk about things the way you talk about it is measuring it over the life of the discharge. Can I ask you to keep referring to how the industry talks about something. Does the industry use the term average and were any of the references, the textbooks, the whatnot did they say, did they use the term average and in particular in reference to a current or is are we in a situation where the claim language is actually a departure from the way the industry talks about it and we have to figure out whether that departure what to do with the departure to distinguish it from whatever it is the industry is talking about in different terms or to fold it into what the industry uses different terms to talk about. I have to say I don't know if Linden anywhere talks about average or doesn't talk about average. I can't answer that affirmatively one way or the other. I'd have to go back and look at Linden. It's a huge thick textbook. I think here we are using patentee is using the term consistent with the usage in the industry. I think folks understand that. You can't say that he's using the term of greatest difficulty, average consistent with the term the way the term is used in the industry if you can't even identify a single place where the industry uses the term. Understood. So what does the word average mean in the claim? Here, I believe, and I think we also just can't focus on the one term. You've got to consider the limitation as a whole. When you look at the limitation as a whole it means that that pat can deliver, just like the district court said, just like the PTAB said 20 amps over the entire capacity. Close to 20 amps over the entire capacity. That's what it means. What if we said the claim construction needs to say the word average average 20 amps over the capacity? I don't think that would change anything here. Based upon the references, I mean, if you look at the underlying board decision, what they found was is none of the references teach 20 amps over the entire capacity. They didn't limit it to constant or up and down. So if you were to change that construction, I don't think it would change the outcome. They also said there was no Regardless of what the construction is, I don't think it alters the outcome in these cases at all in terms of the IPR. We haven't devoted too much time to the issue of motivation to combine. That is a central issue. I think there's two other issues that they raised in their briefs. One was whether the board properly considered the scope and content of the prior art from the perspective of one of ordinary skill in the art. And two is whether they required explicit motivation to combine in the references themselves. I think the board got it right on both of those points. It absolutely considered the scope and content of the prior art from the perspective of one of ordinary skill in the art. It considered all of the appellant's arguments and statements from its expert. It made decisions and credibility determinations between the different experts. And there is substantial evidence to support its conclusions on what the prior art teaches and what it doesn't teach. With respect to motivation to combine, I think the board absolutely got it right again. They didn't ignore the arguments from the appellant. They didn't ignore the arguments from their expert. They considered all the arguments and the statements from the expert and again made credibility determinations. They credited our expert with his statements as to why one would not be motivated to combine. So they weren't looking for an express motivation to combine in the references. They specifically said, we've looked at the statements and the arguments from both sides and both experts and we believe the appellee's here on our side. Can I just double check something? Sure. At least in the snap-on IPRs maybe not so much in the Shervan, but we don't have to care about those anymore. I took the board's discussion about no sufficiently proven motivation to combine to fold in a notion of no reasonable expectation of success. That is it was at crucial places the board said the relevance would not think to do this because they wouldn't think it would work. And I guess I took that to be rather central to your case in part because I took your secondary consideration evidence to be something like everyone knew what the goal was nobody could figure out how to do it until we did. So I think you're absolutely right on the secondary consideration point that's the evidence that was presented I think part of it in terms of the obviousness, motivation to combine, may be at least somewhat based upon the outcome determination but I don't think entirely I do think when you bring in the three references If you take out expectation of success how do you square your secondary consideration theme, everybody knew what the goal was here nobody could do it with an idea that nobody was motivated to start combining as many different things as they could to reach the goal they just couldn't Well I think a couple things the motivation the things that folks were trying to do I think was just to get more power out of the battery pack I don't know that everybody was motivated to do what Milwaukee did was to try this specific chemistry to produce these specific amp hours or an amperage so there was a general consensus in the industry we want more power, folks always want more power from battery packs but I don't know that folks were as focused on using this type of chemistry and this type of construction with what we've got in the claim I think another way of stating your argument is that these proposed combinations Sato, lots of problems with Sato super high discharge rate be very dangerous danger of overheating etcetera and then for the Hilti proposed rejection with Yanai those proposed usages of the various different cells in Yanai wouldn't get you to 20 amps so it's a technical problem with the references being relied upon for trying to make this claim as benchmark I think you're right again on both of those on Yanai it was a calculation that was done incorrectly the expert there, Dr. Abraham really just missed it and in fact when you get down to the end he admitted that he did the calculations wrong and the only combination in the institution decision wouldn't get you to 20 amps they would have to add other cells or something else so I think it just doesn't get you there on Yanai and I think here on Sato, you're right first of all it's a high discharge current there's no indication that you would be able to put those cells together into a battery pack especially with the halage material that retains heat and wants to introduce it back into the battery, that's the antithesis of what you need to do in this type of situation you're well over your time we took you there we thank you for your argument we'll just give Mr. Parkey five minutes of rebuttal time thank you thank you would you mind starting with addressing the point that was made that the board's decision should be affirmed even if it's claimed construction was wrong about the need to hover around 20 during the life as opposed to getting to a numerical average around 20? of course, so under the correct PRI where you have this average which would encompass these intermittent cuts the prior art unquestionably discloses the limitations of the claim and we argue in our brief that even under the adopted construction, the prior art references meet the limitation but it's unquestionable even under the board's notion that Sato and that combination would lead to overheating, for example so the board relied heavily on this unsupported I guess the problem is, whatever the articulation of the claim hovering at constant 20 amps average of 20 amps the reasoning for combining Sato with Fore and Halage the board identified specific problems and was more persuaded by the other side's expert than the expert in terms of whether those problems are real or not and so there's this more fundamental question of whether Sato's allegedly more experimental type battery cell would just be something that's too dangerous to combine with other Sato battery cells to create a battery pack for a cordless power pool so there's that more fundamental problem you've got to get over before you can debate whether Sato would meet the your conception of an average discharge rate I would push back on the combination of Sato cells leading to overheating that was an argument that was concocted by Milwaukee's expert there's no indication in Sato that the cells overheat and in fact the cells in Sato were assembled or built tested and confirmed to meet the 20 amp limitation test let me just ask if we say there's substantial evidence to support the board's finding that there wouldn't be a reasonable expectation of success I suppose in combining Sato with Halage and 4 then the claim construction is just a moot technical one it's not moot because in combining 4 and Sato as you recognize the board relied on this notion of overheating and there's I know but I'm taking that away from you for a second just so I can organize in my mind what is the importance of the debate over the claim construction if hypothetically I were to accept that I'm going to give deference to the board's finding that one wouldn't be motivated to combine these things for various reasons is that fair to say? I don't think it's fair to say in the sense that the board's finding that you wouldn't be motivated to combine 4 and Sato was based on its adopted construction which requires that single continuous use over the entire rated capacity if you adopt Snap-On's construction where it's this intermittent use and there's testimony that that obviates the overheating you don't have that problem overheating because one of the and this is unrebutted testimony from one of Snap-On's experts Dr. Ed Chalkwick that an intermittent discharge allows the cell to sustain higher average discharge currents and that's a JA31205 and 31216 to 217 and what he explains there is that when the battery is able to rest in between cuts it re-equilibriates the battery and he goes into some details about the chemicals in the anode and cathode reducing polarization but what he's saying there is that reduces any potential overheating so the basis for the board rejecting the combination of 4 and Sato under their construction is obviated under Snap-On's proposed construction where you can have these intermittent cuts you don't have that problem of overheating and you don't have that problem that maybe one of ordinary school in the yard wouldn't have been motivated to combine those two references which as we discussed in our brief we disagree with but I just as far as harmless error Okay you got 37 seconds do you want to conclude? Yes So here there were Can you argue that argument in your brief? Just curious this point about um now you've got all this resting periods in this intermittent We do in our brief and it's towards the end of the claim construction section in our opening brief so around page 31 So it's on page 35 and 36 line 4 there's a statement there's no question that a given cell will be able to deliver a given current more easily if discharged intermittently as opposed to continuously and it cites to the declaration of Dr. Ranchoff Thank you Thank you